**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Century 21 Real Estate LLC, | ) No. CIV 03-0053-PHX-SMM |
| | ) |
| Plaintiff , | ) **MEMORANDUM OF DECISION AND** |
| | ) **ORDER** |
| vs. | ) |
| | ) |
| | ) |
| Century Insurance Group and Century | ) |
| Surety Co., | ) |
| | ) |
| Defendants. | ) |
| | ) |

        Plaintiff Century 21 Real Estate LLC ("C21") initiated this action against Defendant

Century Surety Co. ("Century") in January 2003, alleging that Century's service marks –

"Century Surety Group," "Century Insurance Group," and "Century Surety" (collectively,

the "Century Marks") – infringe upon and dilute certain of C21's marks – "Century 21 &

Design," and "Century 21 Real Estate" (collectively, the "C21 Marks"). (Dkt. 1.) C21 seeks

cancellation of Century's registered mark "Century Insurance Group" (Count X), opposes

Century's application for registration of the mark "Century Surety Group" (Count IX) and

seeks money damages for claims of trademark infringement, dilution, and unfair competition

(Claims I-VIII).[1]  (Dkt. 1 ¶¶ 5,12-14,17,22, 29,36,40,45,50,55, 58-61; Dkt. 13 ¶¶62-70.)

------

        [1] As this Court previously explained, C21's Complaint does not allege that Century has
infringed the marks "New Century Title Company" or "21st Century Insurance Company."  See
Dkts. 177 at 2 & n.2; 200 at 2-14.  Therefore, once again, the Court will exclude all irrelevant

On March 16, 2006, this Court granted Century's motion for summary judgment on C21's claims of infringement, dilution, and unfair competition (the "March 16 Order"). See Dkt. 177. With respect to C21's infringement and unfair competition claims, the Court held C21 failed to establish a triable issue of fact as to whether Century's use of the Century Marks is likely to confuse reasonably prudent consumers. (Dkt. 177 at 7-45.) With respect to C21's dilution claims, the Court held that C21 failed to establish a triable issue of fact as to whether the Century Marks dilute the C21 Marks. (Id. at 45-51.)

Now pending before the Court is Century's Motion for Summary Judgment on Claims IX and X (the "Registration Claims"). (Dkt. 221.) Because familiarity with the March 16 Order is presumed, the Court sets out only facts bearing on the Registration Claims.

## BACKGROUND[2]

### I.   Relevant Procedural Background

On September 9, 1997, Century filed United States applications for registration of the service marks "Century Surety Group" and "Century Insurance Group" for "'Underwriting insurance in the fields of surety bonds, environmental bonds, environmental damage, workers' compensation, commercial general liability, and commercial property, in class 36'" (the "Applications"). (Dkts. 11 ¶5; 86, Ex.2 at Tabs 20-21.) In March 1999, Century's Applications were published for opposition. In June 2002, Century's Application for "Century Insurance Group" matured into a registered mark. (Dkts. 11¶6; 13¶6; 124, ¶24 at

---

arguments and statements of fact referring to New Century Title Company, 21st Century Insurance Company, and any other marks not identified in C21's complaint or counterclaim. The Court also strikes as irrelevant and improper all evidence submitted by C21 in opposition to the instant motion for summary judgment that concerns New Century Title Company, 21st Century Insurance Company, and any other marks not identified in C21's complaint or counterclaim. For example, C21 refers to the "Century 21" mark issued registration number 2178970 (see dkt. 229 at 5, line 1). This mark is not referred to in C21's complaint or counterclaim and is therefore disregarded.

[2] Unless otherwise indicated, the facts discussed in connection with the instant summary judgment motion are undisputed. For the reasons set forth in footnote 1, supra, the Court has excluded irrelevant arguments, "facts," and evidence that refer to New Century Title Company, 21st Century Insurance Company, and other marks not identified in C21's complaint or counterclaim.

1   9.)  This action was brought by C21 on January 9, 2003.  (Dkt. 1.)  As noted, C21 seeks
2   cancellation of the "Century Insurance Group" mark (Count X) and opposes Century's
3   application for registration of the mark "Century Surety Group." (Count IX).  (Dkts. 1 at ¶¶
4   58-61; 13 at ¶¶62-70.)

5   **II.    Relevant Factual Background**

6       **A.   Century 21**

7           Incorporated in 1971, C21 is a real estate brokerage franchise company that grants
8   franchises to independently owned real estate businesses.  (Dkt. 124 ¶34 at 108.)  These
9   franchisees operate under the name "Century 21" and a "doing business as" name, for
10  example, Century 21 Smith Realty (the "Franchisees"). After it was founded, C21 grew into
11  a nationwide organization.  (Dkt. 124, ¶21 at 104.)  By 1976, C21 had become and remains
12  today the leading franchisor in the field of real estate brokerage services.  (Id. ¶24 at 105.)
13  In October 1985, TransWorld Corporation sold C21 to Metropolitan Life Insurance Co.
14  ("MetLife"). (Id. ¶26 at 106.)  In August 1995, MetLife sold C21 to Hospitality Franchise
15  Systems, Inc., which subsequently merged and became Cendant Corporation ("Cendant").
16  (Id. ¶29 at 107.)

17          C21 began using the Century 21 Marks in 1972.  (Id. ¶59 at 11.)  On April 12, 1977
18  and February 7, 1978, C21 applied to register the marks "Century 21" and "Century 21 &
19  Design" for "real estate brokerage services" (the "Real Estate Registrations").  (Dkt. 86, Ex.
20  10 at Tabs 18-19.)  On February 17, 1987, C21 applied to register the mark "Century 21" for
21  "insurance brokerage services, class 36" (the "Insurance Brokerage Registration").[3]  (Dkts.
22  86, Ex. 10 at Tab 16; 124, ¶¶105-06 at 13-14.)  All three applications were granted, and the
23  marks have become statutorily "incontestable" under 15 U.S.C. § 1065.  (Dkt. 123 ¶3 at 7.)

24
25          [3] C21's counterclaim improperly cites the mark as "Century 21 Insurance."  Dkt. 13 at ¶63.
26  No evidence supports that this mark, rather than "Century 21," was ever registered.  The United
    States Patent and Trademark Office (the "USPTO") shows that the mark "Century 21 Insurance
27  Services, Inc." was cancelled on January 7, 2001.

28

1

### B.   Century Surety Company

2      Century is an Ohio corporation that has been in business since 1978, and was

3  originally formed as a subsidiary to Century Agency, Inc., an insurance agency created in

4  1965.  (Dkt. 124¶¶ 2-3 at 7,24.)  Century is an underwriter of surety bonds and specialty

5  commercial insurance geared to non-standard risks not covered by most admitted commercial

6  insurance carriers.  (Id.¶9 at 8.)  "Non-standard risks" are often called "excess and surplus,"

7  because non-standard risks are not within state-defined risk parameters.  (Id. ¶ 8 at 8.)

8      Century's specialty non-standard risk commercial insurance is sold by general agents

9  to retail agents primarily on an excess and surplus lines basis.  (Id. ¶9 at 8.)  Century is

10 authorized to underwrite surety bonds and non-standard risk commercial insurance in 49

11 states and the District of Columbia, and is an admitted underwriter in six states.  (Id. ¶¶9,13-

12 14 at 8.)  Where Century is an admitted underwriter, it sells non-standard risk commercial

13 insurance on an excess and surplus lines basis through general agents.  (Id. ¶41 at 10.)

14      Century began underwriting surety bonds in 1978, including environmental and coal

15 reclamation bonds.  (Id. ¶15 at 8.)  In 1981, Century began underwriting inland marine

16 insurance, a type of commercial property insurance.  (Id. ¶10 at 8.)  In 1984, Century began

17 underwriting an expanded line of non-standard risk commercial property and liability

18 insurance, which it continues today.  (Id. ¶¶ 11-12 at 8.)  Within the non-standard risk

19 insurance market, Century underwrites commercial property insurance, commercial liability

20 insurance, surety bonds, environmental hazard bonds, and commercial multi-peril insurance,

21 which is a combination of commercial property insurance and commercial liability insurance.

22 (Id. ¶ 4 at 7.)  Century's legal name appears on its insurance policies.  (Id. ¶31 at 9.)

23                    **SUMMARY JUDGMENT STANDARD OF REVIEW**

24      A court must grant summary judgment if the pleadings and supporting documents,

25 viewed in the light most favorable to the nonmoving party, "show that there is no genuine

26 issue as to any material fact and that the moving party is entitled to a judgment as a matter

27 of law."  FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);

28

1  Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994).  Substantive
2  law determines which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
3  248 (1986).  Thus, mere allegations of a factual dispute between the parties will not defeat
4  an otherwise proper motion for summary judgment.  Rather, Rule 56 requires that there be
5  a genuine issue of material fact, which is a dispute capable of affecting the outcome of the
6  case.  Id.  Therefore, summary judgment is proper if, under governing laws, there is only one
7  reasonable conclusion as to the verdict; if reasonable finders of fact could resolve a factual
8  issue in favor of either party, summary judgment should not be granted.  Id.

9       The movant on a summary judgment motion bears the initial burden of providing a
10  legal basis for its motion and identifying those portions of the record which demonstrate the
11  absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  If the moving party
12  satisfies this burden, the opposing party may not rely on denials in the pleadings but must
13  produce specific evidence, through affidavits or admissible discovery material, to show that
14  a genuine issue for trial exists.   See Fed.R.Civ.P. 56(e).  All inferences drawn from the
15  evidence must be viewed in the light most favorable to the non-moving party.  Eastman
16  Kodak Co. v. Image Tech'l Servs., Inc., 504 U.S. 451, 456 (1992). However, inferences must
17  be based on evidence which, if believed, would be sufficient to support a judgment for the
18  nonmoving party.  Celotex, 477 U.S. at 322.  Moreover, inferences  cannot be created by
19  pointing to "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co.
20  v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, deference to the nonmoving party
21  has limits: (i) a plaintiff cannot rest on the allegations in her pleadings to overcome a motion
22  for summary judgment (Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir.
23  1995)); and (ii) self-serving affidavits will not establish a genuine issue of material fact if
24  they fail to state facts based on personal knowledge or are too conclusory (Rodriguez v.
25  Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001)).

26
27
28

# DISCUSSION

## I.      Law of the Case Applies Here

"The doctrine of 'law of the case' is rooted in the concept that courts should generally follow earlier orders in the same case and should be reluctant to change decisions already made, because encouragement of change would create intolerable instability for the parties." Ridgeway v. Montana High School Ass'n, 858 F.2d 579, 587 (9th Cir. 1988) (citation omitted).  Under law of the case doctrine, a court is "generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case." Milgard Tempering, Inc. v. Selas Corp. of America, 902 F.2d 703, 715 (9th Cir. 1990).

For the law of the case doctrine to apply, "the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.'" Id. (citations omitted); see also Lower Elwha Band of S'Klallams v. Lummi Indian Tribe, 235 F.3d 443, 452 (9th Cir. 2000).  Courts adhere to the doctrine of law of the case and give preclusive effect to prior decisions on legal issues in the same case unless (1) substantially different evidence is subsequently presented, (2) there has been a change in controlling law applicable to the previously decided legal issues, or (3) the prior decision was clearly erroneous and would work a manifest injustice unless it is subsequently revisited.  Merritt v. Mackey, 932 F.2d 1317, 1320 (9th Cir. 1991).

The parties disagree as to whether the legal findings in the Court's March 16 Order are to be given preclusive effect under the doctrine of law of the case.  See Dkts. 221 at 2-3; 229 at 3.  Century argues that findings in the March 16 Order are directly applicable here except with respect to issues concerning (i) the similarity of services listed in Century's and C21's application and registrations; and (ii) the similarity of trade channels utilized for the services listed in such application and registrations.  (Dkts. 219 at 4-6; 221 at 3-4.)  Without articulating *why* findings in the March 16 Order do not address the issues presented here, C21 contends law of the case applies "only when it concerns facts necessarily decided previously in this case and there is no change in controlling law."  (Dkt. 229 at 3.)  It is clear that *many*

1   of the legal findings set forth in the March 16 Order are relevant to determining whether

2   summary judgment should be granted to Century on C21's Registration Claims, the bases of

3   which are likelihood of confusion and dilution.

4          In determining whether law of the case applies here, it is important to bear in mind the

5   standards which govern both an infringement claim and a registration claim based on

6   likelihood of confusion.  As is the case with most registration claims based on likelihood of

7   confusion (see 15 U.S.C. § 1052(d)), the ultimate issue is whether the contemporaneous

8   registration of both Century's Marks and C21's Marks will likely cause confusion.  See

9   Dkts. 1 at ¶¶58-61; 13 at ¶¶62-70 (C21 alleges that registration of Century Marks will likely

10  cause confusion).  Because C21's Registration Claims are based on likelihood of confusion,

11  the infringement claim resolved in the March 16 Order addresses the same issue presented

12  here:  "whether the similarity of the marks is likely to confuse customers about the source

13  of the" services.  E & J Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1290 (9th Cir.

14  1992).  Thus, except with respect to the services and trade channels stated in the relevant

15  application and registrations, which this Court has not yet addressed, legal findings in the

16  March 16 Order pertaining to likelihood of confusion apply here under law of the case.

17         Similarly, the standards that govern both dilution claims and registration claims based

18  on dilution are identical.  See 15 U.S.C. §§ 1063(a), 1064, 1125(c).  As C21 points out,

19  Congress recently revised the statutory requirements of dilution.  See Trademark Dilution

20  Revision Act of 2006, Pub.L. 109-312, 120 Stat. 1730 (Oct. 6, 2006).  However, the Court's

21  March 16 Order, which held that C21 failed to establish a triable issue of fact regarding

22  dilution, was based on two alternative theories not impacted by the change in law.  See dkt.

23  239.  Thus, legal findings in the March 16 Order pertaining to dilution apply here under law

24  of the case.

25  **II.    Applicable Trademark Law**

26         Generally speaking, a service mark is a distinctive mark used to identify and

27  distinguish services, such as insurance and real estate, while a trademark is typically used to

28                                              - 7 -

identify and distinguish tangible goods.  See American Int'l Group, Inc. v. American Int'l Bank, 926 F.2d 829, 830 n.1 (9th Cir. 1991).  Service marks are registrable in the same manner and entitled to the same protection under federal law as trademarks.  See 15 U.S.C. § 1053.  Moreover, Congress has expressly provided courts with authority over the USPTO on registration issues involving service marks:

> In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.  Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C. § 1119.  The net effect of § 1119 is to provide this Court concurrent power with the USPTO to rule on the instant Registration Claims.

C21 alleges that Century's federally registered mark "Century Insurance Group" should be cancelled and its federal application for registration of the mark "Century Surety Group" should be denied because both Marks create a likelihood of confusion with, 15 U.S.C. § 1052(d), and are likely to dilute, C21's Marks, id. §§ 1063-1064.  Dkts. 1 at ¶¶58-61; 13 at ¶¶62-70.

**III.   Likelihood of Confusion**

    **A.   C21's Common Law Rights and Real Estate Registrations**

Cancellation of a registered service mark and denial of an application for registration of a service mark is appropriate if there is a likelihood of confusion between the accused's service mark and one or more of plaintiff's service marks. 15 U.S.C. § 1052(d).  In order to determine whether contemporaneous use of the parties' marks is likely to confuse a reasonably prudent consumer as to the origin of services bearing the accused mark, courts

1    apply the likelihood of confusion test. M2 Software, Inc. v. Madacy Entertainment, 421 F.3d

2    1073, 1080 (9th Cir. 2005).

3         In the Ninth Circuit, the likelihood of confusion test requires courts to consider eight

4    factors, referred to as the Sleekcraft factors: (1) strength of the asserted mark; (2) similarity

5    of the marks; (3) similarity or relatedness of the parties' services; (4) marketing channels

6    used for services; (5) degree of care likely to be exercised by purchasers of services; (6)

7    evidence of actual confusion; (7) defendant's intent in selecting the accused marks; and (8)

8    likelihood of expansion of service lines. Surfvivor Media, Inc. v. Survivor Productions, 406

9    F.3d 625, 631 (9th Cir. 2005), citing AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49

10   (9th Cir. 1979) ("Sleekcraft"), abrogated in part on other grounds by Mattel, Inc. v. Walking

11   Mountain Prod., 353 F.3d 792, 810 n.19 (2003).  The likelihood of confusion test is fluid,

12   and every factor need not be shown, provided that strong showings are made with respect to

13   some of them.  See Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129-30,

14   1132 (9th Cir. 1998) (allowing case to proceed to trial where plaintiff overwhelmingly

15   satisfied three Sleekcraft factors).

16        Whether a party "wins" a majority of the Sleekcraft factors is not the point.  Nor

17   should "[t]he factors ... be rigidly weighed; we do not count beans." Id.  at 1129.  Although

18   some factors – such as the similarity of the marks and whether the services directly compete

19   – will always be important, it is often possible to reach a decision on the likelihood of

20   confusion after considering only a subset of the factors.  Id. at 1130-32.  As the Court applies

21   the Sleekcraft test, it will "consider what each factor, and--more importantly--what the

22   analysis as a whole, reveals about the ultimate question . . . :  the likelihood of consumer

23   confusion as to the origin of . . . service[s] bearing the allegedly infringing mark."

24   Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1141 (9th Cir. 2002).  Finally,

25   "[l]ikelihood of confusion requires that confusion be probable, not simply a possibility."

26   Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).

27

28                                        - 9 -

1    Likelihood of confusion may be decided as a matter of law.  See Abdul-Jabbar v.

2    General Motors Corp., 85 F.3d 407, 413 (9th Cir. 1996) (recognizing that summary judgment

3    is appropriate where a jury could not reasonably conclude that most Sleekcraft factors weigh

4    in non-moving party's favor).  However, the Court is mindful of the Ninth Circuit's directive

5    that district courts exercise caution in granting summary judgment regarding the likelihood

6    of confusion, as careful assessment of the factors that go into this determination usually

7    requires a full record.  See Clicks Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1265 (9th

8    Cir. 2001).  As previously noted, the record provided here is overflowing.  See Dkts. 83-166.

9    Given the different analysis that applies to the third and fourth Sleekcraft factors (see

10   infra at 12-16) – similarity of services and trade channels utilized – for registration claims,

11   the Court will first analyze the likelihood of confusion between Century's registration and

12   application for "Century Insurance Group" and "Century Surety Group" and C21's common

13   law rights and Real Estate Registrations.  The Court will then analyze the likelihood of

14   confusion between Century's registration and application for "Century Insurance Group" and

15   "Century Surety Group" and C21's Insurance Brokerage Registration.  See infra at 18-21.

16              **1.  Strength of the Century 21 Marks**

17   Although the C21Marks are arbitrary and commercially strong for real estate

18   brokerage services, the Court previously determined that C21 failed to demonstrate its Marks

19   are similarly well-known for insurance services, particularly given the lack of C21's actual

20   use and advertising of such marks in the insurance industry.  See Dkt. 177 at 12:3-15:10.

21   Moreover, because the record establishes that the real estate and insurance fields are crowded

22   with marks using the term "Century," the Court determined there is no dispute that the

23   strength of C21's Marks belongs only to the unitary mark "Century 21," not the word

24   "Century" alone.  Id. at 13:3-24; 15:11-18:27.  The strength of unitary marks cuts both ways

25   in the likelihood of confusion analysis.  The better known C21's Marks are, the more readily

26   consumers become aware of even small differences.  Given the strength of C21's unitary

27   mark – "Century 21" – the Court determined that consumers would immediately notice that

28                                    - 10 -

Century's Marks do not contain the numeral "21." See dkt. 177 13:3-24.  Evidence showing extremely prevalent use of the term "Century" in both the insurance and real estate industries also makes C21 Marks less distinctive.  Based on undisputed evidence showing substantial use of the term "Century" in the real estate and insurance industries, the Court found no reasonable jury could conclude that the public would expect all companies with "Century" in their names to be related to C21, or that all services using the name "Century" emanate from a single source.  Rather, Century's Marks are just two of many "Century" marks in a crowded field.[4]  See id. at 15:11-18:27.

Given the Court's findings regarding the inherent strength of C21's Marks for real estate services, the weakness of the C21 Marks for insurance services, and weakness resulting from overwhelming third-party use of the term "Century" in the real estate and insurance industries, the strength factor favors C21 but only slightly (id. at 19:1-19).

## 2.   Similarity of the Marks

In the March 16 Order, the Court found that no jury could reasonably conclude the mark "Century 21" is similar to "Century," in terms of sound, appearance, and connotation.   Id. at 19:20-22:14.[5]   Of primary importance to this determination is the undeniable fact that the mark "Century 21" must be considered a unitary term, with equal

---

[4] The only reasonable inference from evidence showing substantial use of the term "Century" is that consumers have become conditioned to recognize that many entities in the fields of real estate and insurance use the term "Century."  The common presence in marks of elements extensively used by others cause purchasers not to rely upon such elements as source indicators but to look to other elements as a means of distinguishing the source of the services.  As a result, the prevalence of the term "Century" in the industries at issue here is key here to determining the distinctiveness of C21's Marks and plays a significant role in the likelihood of confusion analysis.

[5] The Court previously compared "Century" and "Century 21," as those are the most similar of the parties' marks (dkt. 124 ¶141 at 16).  See Dkt. 177 at 19 n.14.  The Court rejects C21's contention now that the Court has not previously compared C21's Marks to the marks specified in the registrations at issue here – "Century Surety Group" and "Century Insurance Group" – because "Century" is the dominant element of both marks and the descriptive phrases "Surety Group" and "Insurance Group" have been disclaimed.  See Dkt. 97, exs. 69-70.

weight provided to both elements of the mark (id. at 21:6-22:2).  Because C21's Marks place equal significance on the numeral "21" and the word "Century," there is no genuine issue of material fact that the Marks at issue here differ visually and aurally, and convey entirely different commercial impressions and meanings (id. at 19:20:-21:5).[6]  The Court's finding that confusion is not likely to result from the contemporaneous use of C21's and Century's Marks is buttressed by undisputed evidence of the commonality of the term "Century" in the real estate and insurance industries (id. at 15:11-18:27, 22:3-7).  Given the prevalence of the term "Century" in the real estate and insurance industries and the fact that C21's Marks are unitary, the mere commonality of "Century" in both parties' marks is an insufficient basis on which to find similarity and likelihood of confusion.  (Id.)  Thus, the similarity factor favors Century.  See supra at 10-11 & n.4.

### 3.    Similarity of Services

Next, the Court looks at the similarity of services described in the application and registrations.  For registration claims, it is well-settled that the issue of likelihood of confusion must be "based on an analysis of the mark as applied to the . . . services recited in applicant's application vis-a-vis the . . . services recited in an opposer's registration, rather than what the evidence shows the . . . services to be."  Bank of Commerce v. Wells Fargo Bank, N.A., 811 F.2d 1490, 1491 (Fed. Cir. 1987).  Because the Court previously compared the services *actually provided* by Century and C21 (dkt. 177 at 22:15-33:10),  the analysis of this factor will *not* rely on findings in the March 16 Order.  See supra at 7:14-15, 10:9-10.

In the present case, the services identified in C21's Real Estate Registrations – real estate brokerage services (dkt. 86, ex. 10 at 18-19) – include all types of real estate

---

[6] Century's Marks, with their dominant emphasis on the word "Century," suggest an entity that has been established for a long time, perhaps one hundred years, and reflects its past history. C21's Marks, on the other hand, suggest innovation and the future.  See Century 21 Real Estate Corp. v. Century Life of America, 1992 WL 809137, *5 (T.T.A.B. 1992).  In this respect, C21's Marks convey ideas of creativity and innovation.  Century's Marks, on the other hand, imply a well-established and long-standing foundation.

1    brokerage services, not just the services actually provided.  Bank of Commerce, 811 F.2d at

2    1491-92.   The services stated in Century's application and registration – underwriting

3    insurance in the fields of surety bonds, environmental bonds, environmental damages,

4    workers' compensation, commercial general liability, and commercial property (dkt. 97, exs.

5    69-70) – include all types of underwriting services.  Id.  With respect to C21's common law

6    rights, the Court previously determined there is no genuine dispute of fact that (i) C21 has

7    not directly competed against Century in the insurance industry (id. at 23:19-31:21) and (ii)

8    C21 Franchisees do not sell or underwrite insurance under C21's Marks, so use of the C21

9    Marks for insurance services does not inure to C21's benefit (id. at 28:1-31:18).  Thus, C21's

10   common law rights are limited to real estate brokerage services, not insurance.

11          Comparing the real estate brokerage services provided by C21 with the insurance

12   underwriting services provided by Century, the Court concludes no reasonable jury could

13   conclude that C21 and Century are direct competitors or that there is any overlap between

14   real estate brokerage services and insurance underwriting services (dkt. 177 at 31:22-33:10).

15   Rather, the two services are substantially distinct, as they perform entirely different functions

16   and appeal to different groups of consumers attempting to have different types of needs

17   serviced.  Those distinctions, moreover, outweigh any superficial similarity which could

18   arise, for example, because some real estate brokers also sell insurance and nearly all real

19   estate owners buy insurance.  See Glow Industries, Inc. v. Lopez, 273 F.Supp.2d 1095, 1113

20   (C.D.Cal.2003) (generally similar products are not substantially similar if they have key

21   differences designed to appeal to distinct customer groups).  Accordingly, the Court finds no

22   reasonable jury could conclude Century's insurance underwriting services are so closely

23   related to C21's real estate services that confusion would likely result from contemporaneous

24   use of their dissimilar marks.  This factor favors Century.

25          The Court also rejects any argument that real estate and insurance are "related,"

26   because some real estate agents also sell insurance and nearly all real estate owners buy

27   insurance.  C21's Real Estate Registrations are strictly limited to "real estate brokerage

28                                        - 13 -

services," and do not include any other services utilized by real estate owners.   Moreover, based on the Court's finding that C21's Marks and Century's Marks are dissimilar as a matter of law (supra at 11-12), no jury could reasonably conclude that confusion would likely result from contemporaneous use of C21's and Century's Marks even assuming, *arguendo*, real estate brokerage services and underwriting services are related.[7]

### **4.**   **Services Marketed Through Similar Channels/To Similar Customers**

As previously stated, the issue of likelihood of confusion must be determined in light of the services set forth in the opposed application and pleaded registration and, "in the absence of specific limitations in the application and registration, on consideration of the normal and usual channels of trade and methods of distribution" for such services.  CBS Inc. v. Morrow, 708 F.2d 1579, 1581 (Fed. Cir. 1983).  Here, C21's Real Estate Registrations and Century's application and registration are unrestricted.  See Dkts. 86, Ex. 10 at Tabs 16, 18-19; 97, Exs. 69-70.  Thus, both parties' services are marketed or will be marketed in all the normal channels of trade for the identified services and to all the usual classes of purchasers of such services.  See CBS Inc., 708 F.2d at 1581.  Because the Court previously compared the parties' actual trade channels and customers (see dkt. 177 at 33:11-36:5),  the Court will *not* rely on findings in the March 16 Order.  See supra at 12:13-20.

In the present case, there can be no genuine dispute that the parties offer different services – real estate and insurance – to some of the same consumers through some of the same channels of trade.  However, even if some of the *ultimate* end-users of insurance and real estate are the same, it cannot reasonably be disputed that the remaining targets of C21's

---

[7] C21 does not discuss in detail why real estate and insurance services are closely related, nor does it explain how the ordinary consumer would likely be confused even assuming such relation.  See Kangol Ltd. v. KangaROOS U.S.A., 974 F.2d 161, 163 (Fed. Cir. 1992) ("likelihood of confusion must be determined from the perspective of the ordinary consumer").  Rather, C21 argues only that, for registration claims, likelihood of confusion must be determined on the basis of the services identified in the application and registrations, rather than the services actually provided. The Court has properly applied the law in this manner.  See supra at 12-14.

1   and Century's sales efforts are different, as evidenced by the different types of advertising

2   media used to sell their services.  Customarily, real estate brokerages sell their services to

3   people and businesses interested in buying and selling residential and commercial real

4   property.  To achieve that goal, real estate brokerages rely heavily on direct print marketing

5   to real estate brokers and agents, appraisers, banks, savings and loans, and, of course, people

6   and businesses interested in buying or selling real property.  In addition, advertising and

7   marketing of real estate is accomplished by Internet, face-to-face communications and

8   advertisements on television, radio, newspapers, and magazines.  Real estate agents do not

9   advertise in insurance industry publications or publications directed to general or retail

10  insurance agents, or at trade shows attended by insurers.

11          Underwriting insurers, by contrast, primarily seek to sell their services to retail

12  insurance brokers who, in turn, sell insurance to persons and businesses seeking to insure

13  various risks.  Because there are no restrictions in Century's identification of services,

14  however, the law requires the Court to assume that Century markets it services through all

15  usual channels – that is, through direct print marketing and face-to-face communication with

16  potential policyholders and retail agents.  See CBS Inc., 708 F.2d at 1581.  Insurers generally

17  do not advertise on television or radio and do not advertise in newspapers.  Rather, due to the

18  unusual nature of the service they offer, they primarily advertise and promote services in

19  specialty insurance industry publications and at trade shows.

20          Although consumers of both parties' services overlap to a certain extent, and thus

21  it is possible that C21's real estate customers and Century's insurance customers may be

22  subject to direct solicitation from both C21 and Century, it is not reasonable to infer that

23  contemporaneous use of both parties' Marks would likely lead to confusion because their

24  services are offered in different marketing contexts to consumers attempting to have different

25  needs serviced.  See Homeowners Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d

26  1100, 1110 (6th Cir. 1991) ("if the services of one party are sold through different marketing

27  media in a different marketing context than those of another seller, the likelihood that either

28                                          - 15 -

1  group of buyers will be confused by similar service marks is much lower than if both parties

2  sell their services through the same channels of trade").  Moreover, given the differences

3  between insurance and real estate sales, the parties' marketing efforts are concentrated in a

4  small percentage of the same advertising media and a much larger percentage of different

5  advertising media.  Because *some* of the same customers are likely targeted by both parties

6  through *some* of the same marketing channels, this factor is neutral.

7       **5.**    **Degree of Care Likely To Be Exercised by Purchasers**

8         In the March 16 Order, the Court determined that, because purchasers of non-

9  standard risk commercial insurance are professionals who select insurance after careful

10  deliberation and comparison of multiple bids and the financial stability of underwriters, the

11  purchasing process presents little opportunity for confusion.  See Dkt. 177 at 36:6-37:18.

12  Similarly, there is no reasonable dispute that purchasers of real estate exercise considerable

13  care and sophistication.  Because both non-standard risk commercial insurance and real estate

14  purchases are well-planned, rather than impulse, purchases, there can be no genuine dispute

15  that purchasers proceed cautiously and deliberately in making their choices.  As a result, it

16  cannot reasonably be disputed that purchasers will be aware of the differences in the Marks

17  rendering the services at issue here: "Century" and "Century 21."  Moreover, sophisticated

18  and careful purchasers are more likely to ask questions if there is any doubt about a

19  connection between two marks.  As a result, there is no reasonable likelihood that the

20  sophisticated consumers of C21's and Century's services would not be aware that C21 does

21  not offer underwriting services and Century does not offer real estate services.  See Dkt. 177

22  at 36:6-37:18.  Thus, this factor favors Century.

23       **6.**    **Evidence of Actual Confusion**

24         In order to analyze the "actual confusion" factor, the March 16 Order found no

25  disagreement between the parties that Century has provided its specialty insurance on a

26  nationwide basis since at least 1991 (see Dkt. 177 at 37:26-38:1 & n.26).  Notwithstanding

27  at least 15 years of co-existence, both parties also agreed that there are no known instances

28  of actual confusion between the Marks at issue here, even though more than 4,500 C21

1   Franchisees (who employ a total of 120,000 agents) are required to report infringing uses of

2   the C21 Marks.  See id. at 38:4-40:12 & n.27.  In addition to the lack of confusion by

3   consumers and Franchisees, Century produced deposition testimony confirming that none of

4   the 19 third-party insurers who use the term "Century" were aware of any marketplace

5   conflict with C21 over the word "Century," and that at least three of those insurers receive

6   referrals from C21's franchisees.  Id.  Given the fifteen-year period of time during which

7   Century has used the Century Marks without any instance of actual confusion by consumers,

8   C21 Franchisees, and other "Century" insurance companies strongly suggests there is no

9   likelihood of confusion.  See id. at 40:9-12.  Thus, this factor favors Century.

10                    **7.    Century's Intent in Selecting the Century Marks**

11          In the March 16 Order, the Court found there is no evidence that Century adopted

12   the Century Marks in order to trade on C21's goodwill or to intentionally cause confusion.

13   See Dkt. 177 at 40:13-42:7.  Century's good faith adoption of its Marks was shown by

14   undisputed evidence of the history of the Marks and a trademark clearance search by Century

15   to determine the availability of registering the Marks before applying for registration.  See

16   id. at 40:24-41:24.  Because C21's proof falls far short of proving bad faith, and undisputed

17   evidence shows Century is a good faith user searching for an available mark in an already-

18   crowded field, this factor weighs in favor of Century.

19                    **8.    Likelihood of Expansion**

20          In the March 16 Order, the Court held there is no genuine dispute of fact that the

21   parties do not intend to expand into each other's service lines.  See Dkt. 177 at 42:8-44:6.

22   The evidence demonstrated that Century has no plans to offer personal lines insurance, or to

23   alter its wholesale distribution channel, nor does it plan to market or advertise its services to

24   real estate brokers, the general public, or potential policyholders.  See id. at 42:14-18.  In

25   addition, there is no dispute that C21 has no plans to offer excess and surplus lines insurance,

26   underwrite insurance, or market insurance through general, wholesale agents.  Nor does C21

27   have plans to advertise in insurance publications that Century advertises in, or to attend

28   insurance trade shows in which Century participates.  C21's conclusory assertion that it plans

1  to enter Century's specialty insurance field was rejected as vague, unsupported argument,

2  and mere speculation.  See id. at 42:19-44:6.  Aside from speculation, there is no evidence

3  that the parties intend to expand into each other's service lines.  Thus, this factor favors

4  Century.

5  **9.**   **Conclusion: Common Law Rights and Real Estate Registrations**

6  The Court has thoroughly examined the relevant Sleekcraft factors with respect

7  to C21's Real Estate Registrations and common law rights.  The significant differences

8  between C21's and Century's Marks, the prevalence of "Century" marks in the real estate

9  and insurance industries, the weakness of C21's Marks in the insurance field, the highly

10  sophisticated decision-making process in both industries, and the inherent differences in the

11  nature of services the parties provide warrant a finding of no likelihood of confusion.  This

12  finding is buttressed by the absence of any proof showing (i) actual confusion between the

13  Marks at issue here, (ii) bad faith by Century in adopting its marks, and (iii) expansion plans

14  of either party.  Therefore, the Court finds no reasonable jury could conclude that the

15  contemporaneous use of Century's Marks and C21's Marks in the insurance and real estate

16  brokerage industries will likely confuse consumers.

17  **B.**   **C21's Insurance Brokerage Registration**

18  As shown above, when analyzing registration claims, a different analysis applies to

19  the third and fourth Sleekcraft factors – similarity of services and trade channels.  Supra at

20  12-16.  Because the same findings and conclusions of the other Sleekcraft factors apply

21  equally to the Court's analysis of the likelihood of confusion between Century's application

22  and registration and C21's Insurance Brokerage Registration, they will not be detailed below.

23  **1.**   **Strength of the C21 Marks**

24  Given the Court's findings regarding the inherent strength of C21's Marks in the

25  real estate industry, the weakness of the Marks in the insurance industry, and weakness

26  resulting from third-party use of the term "Century" in real estate and insurance industries,

27  the strength factor favors C21 but only slightly (dkt. 177 at 19:1-9).  Supra at 10-11.

28

1

2        **2.    Similarity of the Marks**

3            In considering the similarity of the Marks at issue here, the Court notes that when

4    marks are used in connection with identical services, "the degree of similarity [between

5    them] necessary to support a conclusion of likely confusion declines." Century 21 Real

6    Estate Corp. v. Century Life of America, 970 F.2d 874, 877 (Fed. Cir. 1992).  Although not

7    identical, the Court concludes that the services identified in C21's Insurance Brokerage

8    Registration are substantially similar to the services identified in Century's registration and

9    application. See infra at 19.  Even though a lower threshold of similarity applies, the Court

10   finds the parties' Marks are substantially dissimilar. See supra at 11-12.  Thus, this factors

11   favors Century.

12       **3.    Similarity of Services**

13           In analyzing the similarity of the parties' services, the Court may not rely on

14   findings in the March 16 Order. Supra at 12.  Instead, the law requires a presumption that

15   the services identified in C21's Insurance Brokerage Registration – "Insurance Brokerage

16   Services" – include all types of insurance services, even though the Court previously

17   concluded that C21 does not actually provide insurance under the C21 Marks (dkt. 177 at

18   23:19-31:21).  Bank of Commerce, 811 F.2d at 1491.  Similarly, the services identified in

19   Century's application and registration – "underwriting insurance in the fields of surety bonds,

20   environmental bonds, environmental damages, workers' compensation, commercial general

21   liability, and commercial property" (dkt. 97, exs. 69-70) – are presumed to include all types

22   of insurance underwriting services. Bank of Commerce, 811 F.2d at 1490.  Comparing the

23   insurance brokerage services set forth in C21's Insurance Registration with the insurance

24   underwriting services identified in Century's application and registration, the Court finds no

25   jury could reasonably conclude that parties' services are not substantially similar, because

26   both identifications encompass the sale of insurance.  Thus, this factor favors C21.

27

28

1

### 4.  Channels Through Which Services are Marketed

2   The identifications of services in C21's Insurance Brokerage Registration and

3 Century's application and registration do not include any limitations with respect to trade

4 channels.  Moreover, because the respective services are substantially similar, the Court

5 assumes that both parties' services move through the same and similar channels, specifically

6 all trade channels normal for services in the insurance industry, and are sold to substantially

7 the same insurance consumers.  <u>See</u> <u>Octocom Systems, Inc. v. Houston Computer Services

8 Inc.</u>, 918 F.2d 937 (Fed. Cir. 1990).  This factor favors C21.

9

### 5.  Degree of Care Likely to be Exercised by Purchasers

10   This factor favors Century because, when purchasing insurance services, even

11 ordinary consumers are likely to exercise great care and know with whom they are dealing.

12 <u>See</u> <u>supra</u> at 16.

13

### 6.  Evidence of Actual Confusion

14   This factor favors Century because, in the fifteen-year period during which both

15 C21 and Century have used their respective Marks, there have been no instances of actual

16 confusion by consumers, C21 Franchisees, and companies in the insurance industry.  <u>See

17 supra</u> at 16-17.

18

### 7.  Century's Intent in Selecting the Century Marks

19   This factor favors Century because C21 has presented no evidence that Century

20 adopted its Marks in order to trade on C21's goodwill or to intentionally confuse insurance

21 consumers.  <u>See</u> <u>supra</u> at 17.

22

### 8.  Likelihood of Expansion

23   This factor favors Century because, aside from speculation, C21 has not presented

24 any evidence that it intends to expand into the business of underwriting or that Century

25 intends to expand into the insurance brokerage business.  <u>See</u> <u>supra</u> at 17-18.

26

### 9.  Conclusion

27   Having examined the <u>Sleekcraft</u> factors with respect to C21's Insurance

28 Brokerage Registration and Century's registration and application, the Court concludes that

1   Century has met its burden of pointing to specific portions of the pleadings, depositions, and

2   other evidence to show the absence of a genuine dispute of material fact regarding the

3   likelihood of confusion if C21's Marks and Century's Marks are contemporaneously

4   registered and used in the insurance industry.  C21, by contrast, has failed to meet its burden

5   of demonstrating a genuine dispute of material fact as to whether contemporaneous

6   registration and use of the parties' Marks is likely to cause consumer confusion.

7           Although it is well-settled that a likelihood of confusion results if the same

8   services are marketed under the same or similar marks, no reasonable jury could conclude

9   that contemporaneous registration and use of the parties' Marks would likely confuse

10  purchasers in determining whether insurance services emanate from the same source or there

11  is an association between the parties.  The Marks at issue here are extremely dissimilar in

12  appearance, sound, connotation, and commercial impression, mainly because the mark

13  "Century 21" is a unitary symbol doing business in an industry dominated by businesses

14  using the term "Century."  See supra at 10-12 & n.4.  Because the Marks are dissimilar, it is

15  highly unlikely that confusion would result from contemporaneous registration and use of

16  the Century Marks and C21 Marks in the insurance industry.  See Kellogg Co. v. Pack'em

17  Enterprises, Inc., 951 F.2d 330, 332-33 (Fed. Cir. 1991) (no likelihood of confusion between

18  "FROOT LOOPS" trademark for breakfast cereal and other products and "FROOTEE ICE,"

19  based on single factor of dissimilarity as to appearance, sound, and commercial impression).

20  Moreover, C21's Marks are particularly weak in the insurance industry, which is crowded

21  by many "Century" terms, and thus commands only a narrow scope of protection.  Supra at

22  10-12.  Finally, the purchase of insurance presents little opportunity for confusion.  Supra at

23  16.  Thus, the Court finds no reasonable jury could conclude that the contemporaneous use

24  of Century's Marks and C21's Marks in the insurance industry will likely confuse

25  consumers.

26

27

28

1   **IV.     Likelihood of Dilution**

2          Having rejected C21's Registration Claims based on likelihood of confusion, the

3   Court considers C21's claim that contemporaneous use of the Century Marks and the C21

4   Marks will likely dilute the distinctive quality of C21's Marks by blurring.[8]

5          On October 6, 2006, the Trademark Dilution Revision Act of 2006 (the "TDRA"),

6   was signed into law and became effective immediately.  See Pub.L. 109-312, 120 Stat. 1730

7   (Oct. 6, 2006).  The TDRA defines dilution as follows:

8                      Subject to the principles of equity, the owner of a famous

9                      mark that is distinctive, inherently or through acquired

10                     distinctiveness, shall be entitled to an injunction against another

11                     person who, at any time after the owner's mark has become

12                     famous, commences use of a mark or trade name in commerce

13                     *that is likely to cause dilution by blurring* or dilution by

14                     tarnishment of the famous mark, regardless of the presence or

15                     absence of actual or likely confusion, of competition, or of

16                     actual economic injury.

17  15 U.S.C. § 1125(c)(1), emphasis added.  Dilution by blurring occurs "when another's use

18  of a mark creates 'the possibility that the mark will lose its ability to serve as a unique

19  identifier of the plaintiff's product.'"  Playboy Enters., Inc. v. Welles, 279 F.3d 796, 805 (9th

20  Cir. 2002) (citation omitted).  In other words, blurring by dilution protects any mark that is

21  both distinctive and famous against the use and registration of marks that would lessen the

22  capacity of the famous mark to identify and distinguish the famous mark owner's services.

23  Both opposition and cancellation claims may be based on claims of dilution by blurring.  See

24  15 U.S.C. §§ 1063(a) and 1064.

25         The TDRA revised the Federal Trademark Dilution Act in three significant ways: (i)

26  a *likelihood of dilution*, rather than *actual dilution*, is now required to establish dilution; (ii)

27

28

_____

[8] C21 does not contend the Century Marks are likely to dilute C21's Marks by tarnishment.

1    courts may apply four factors to determine whether a mark is famous and protection is denied

2    to marks that are famous in only "niche" markets; and (iii) courts may apply six factors to

3    determine whether a mark is likely to cause dilution by blurring.  See House Report on

4    Trademark Dilution Act of 2005 at 8, 25 ("House Report").

5          In the March 16 Order, the Court dismissed C21's federal dilution claim for two

6    *alternative* reasons.  First, as a matter of law, no reasonable jury could conclude that

7    "Century" is identical, or nearly identical, to the mark "Century 21."  See dkt. 177 at 46-47.

8    Although the TDRA no longer requires actual dilution, the new law does not eliminate the

9    requirement that the mark used by the alleged diluter be "identical," "nearly identical," or

10   "substantially similar," to the protected mark.  See House Report at 8, 25; 15 U.S.C. §

11   1125(c)(2)(B) ("'dilution by blurring' is association arising from the *similarity* between a

12   mark or trade name and a famous mark . . . .") (emphasis added); Playboy Enters., Inc., 279

13   at 806 n.41 (elucidating the "identical or nearly identical" standard for dilution); Thane Int'l,

14   Inc. v. Trek Bicycle Corp., 305 F.3d 894, 906 (9th Cir. 2002) ("[t]he marks must be of

15   sufficient similarity so that, in the mind of the consumer, the junior mark will conjure an

16   association with the senior").  As discussed above, the C21 Marks and the Century Marks

17   are neither identical nor substantially similar.  Thus, the Court will deny C21's Registration

18   Claims based on dilution because no reasonable jury could conclude that the C21 Marks are

19   identical, nearly identical or substantially similar to the Century Marks.

20        **Similarity**

21        It is well-settled that the "similarity of marks" test for blurring is more stringent than

22   the similarity of marks test for likelihood of confusion purposes.  Thane Int'l, 305 F.3d at

23   906 (similarity of marks test in dilution context is more stringent than test for infringement).

24   Substantial similarity is required in the dilution context because the mark used by the alleged

25   diluter and the protected mark "must be 'similar enough that a significant segment of the

26   target group of customers sees the two marks as essentially the same.'"  Playboy Enters., 279

27   F.3d at 806 n.41 (quoting Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 832 (8th

28

1    Cir.1999)).  It is not sufficient for dilution if the marks used are just similar; they must be

2    "essentially the same mark."  Thane Int'l, 305 F.3d at 905.

3          The Court previously determined that the differences between the C21 Marks and the

4    Century Marks are so significant that consumers would not be *confused* by their

5    contemporaneous registration and use.  Supra at 18-21.  Given that finding, and now focusing

6    on the Marks in the context of dilution, the Court concludes that no jury could reasonably

7    find the Marks are substantially similar.  See Thane Int'l, 305 F.3d at 906 (similarity of

8    marks test in dilution context is more stringent than test for infringement).  Thus, C21's

9    Registration Claims are denied on this basis alone.

10         **Mental Association**

11         An *alternative* basis for the March 16 Order's dismissing C21's dilution claims is the

12   Court's finding that no reasonable jury could conclude that the C21 Marks are actually

13   diluted by the Century Marks (see dkt. 177 at 47-51).  Although actual dilution is no longer

14   the proper standard for evaluating a dilution claim, a critical component of "actual dilution"

15   is mental association between the marks at issue.  The March 16 Order specifically found that

16   C21 failed to show a genuine dispute of material fact regarding the mental association

17   component of actual dilution.  See Dkt. 177 at 48.  Like the substantial similarity element,

18   the TDRA does not eliminate the requirement that consumers mentally associate the mark

19   used by the alleged diluter with the protected mark.  See 15 U.S.C. §

20   1125(c)(2)(B)("'dilution by blurring' is *association* arising from the similarity between a

21   mark or trade name and a famous mark . . . .") (emphasis added);Mead Data Central v.

22   Toyota Motor Sales, U.S.A., 875 F.2d 1026, 1030-31 (2d Cir. 1989) (applying New York

23   dilution law, which incorporates "likely to cause dilution" standard; no substantial similarity

24   between LEXIS and LEXUS because dilution requires "mental association"); Fruit of the

25   Loom, Inc. v. Girouard, 994 F.2d 1359, 1363 (9th Cir. 1993) ("Whittling away will not occur

26   unless there is at least some subliminal connection in a buyer's mind between the two parties'

27   uses of their marks.").

28

1    In the present case, C21 is seeking to enjoin Century from using the marks beginning

2  with the word Century even though C21 uses the very different mark "Century 21." See Dkt.

3  124 ¶141 at 16.  C21 has never registered the term "Century" alone, does not use or advertise

4  the word "Century" alone, and prohibits its Franchisees from abbreviating or shortening the

5  name "Century C21" to "Century."  Id. ¶¶109-11 at 14,58-59.  Moreover, C21 has not

6  produced any survey information to demonstrate that customers recognize or associate the

7  word "Century" in isolation with the term "Century 21."  Id. ¶¶108,112 at 14.  Given that

8  C21 seeks to prevent Century from using the word "Century," and that the word "Century"is

9  widely used in both the insurance and real estate industries (see supra at 10-12), there is no

10  basis from which a jury could find that consumers mentally associate the word "Century,"

11  standing alone, with the mark "Century 21."

12    Indeed, during the parties' 15 years of (undisputed) co-existence, none of the 4,500

13  Franchisees have mentioned Century to C21 (see Dkt. 124, ¶¶177-179 at 21) and C21 itself

14  only became aware of Century when its registration applications were published for

15  opposition by the USPTO (id. ¶120 at 14).  See Accuride Int'l, Inc. v. Accuride Corp., 871

16  F.2d 1531, 1539 (9th Cir. 1989) ("the parties' concurrent use of 'Accuride' as a trademark

17  for twenty-five years effectively precluded a finding that the value of "Accuride" trade name

18  could be diluted").  C21 does not dispute that it knows of no instance in which anyone has

19  ever mentally associated C21 and Century, and no evidence of mental association has been

20  produced by C21.  See Dkt. 124, ¶¶186-87 at 22.  Because no reasonable jury could

21  conclude that relevant consumers mentally associate the Century Marks with the C21 Marks,

22  C21's Registration Claims based on dilution must be dismissed as a matter of law.

23    **Dilution Analysis Under the TDRA Factors**

24    C21 argues that the TDRA no longer requires the marks at issue be essentially the

25  same.  See Dkt. 235 at 4.  Instead, C21 contends the TDRA requires an analysis of six

26  factors, one of which includes similarity.  Id.  The Court expresses no view on whether the

27  TDRA *requires* the six factor analysis to be applied in resolving registration claims.

28  However, assuming such analysis is required, the Court finds no reasonable jury could

1   conclude that Century's Marks are likely to dilute C21's Marks by blurring.  Thus, the Court

2   will dismiss C21's Registration Claims based on the theory of dilution.

3        The TDRA specifically provides that

4            In determining whether a mark . . . is likely to cause dilution by

5            blurring, the court may consider all relevant factors, including

6            the following:

7                (i) The degree of similarity between the mark or trade

8            name and the famous mark.

9                (ii) The degree of inherent or acquired distinctiveness of

10           the famous mark.

11               (iii) The extent to which the owner of the famous mark

12           is engaging in substantially exclusive use of the mark.

13               (iv) The degree of recognition of the famous mark.

14               (v) Whether the user of the mark or trade name intended

15           to create an association with the famous mark.

16               (vi) Any actual association between the mark or trade

17           name and the famous mark.

18   15 U.S.C. § 1125(c)(2)(B)(i)-(vi).

19        In the present case, applying the factors set forth in the TDRA and assuming,

20   *arguendo*, that C21's Marks are "famous," the Court finds no reasonable jury could

21   conclude that Century's Marks are likely to cause dilution by blurring of C21's Marks.

22        **1.    The Century Marks are Not Similar to the C21 Marks**

23        As previously discussed, no reasonable jury could conclude that the Century

24   Marks are similar to the C21 Marks.  Supra at 11-12.  Thus, this factor favors Century.

25        **2.    The C21 Marks are Inherently Distinctive**

26        Although the mark "Century," standing alone, is not distinctive in either the real

27   estate or insurance industry, there is no genuine dispute that the C21 Marks – the term

28

"Century" followed by the numeral "21" – are inherently distinctive and well-recognized in the real estate industry (see dkt. 124¶¶72-74 at 123-24).  This factor favors C21.

### 3.  C21 Engages in Substantially Exclusive Use of the C21 Marks

Although the evidence overwhelmingly demonstrates that C21 does not engage in exclusive use of the term "Century" (see supra at 10-12), there is no genuine dispute that C21 engages in substantially exclusive use of the mark "Century 21." This factor favors C21 slightly because it is undisputed that Century's Marks do not use the numeral "21."

### 4.  Degree of Recognition of the C21 Marks

C21 has not produced any survey information to demonstrate that customers recognize or associate the word "Century" in isolation with the term "Century 21."  (Id. ¶¶108,112 at 14.)  However, there is no genuine dispute that the C21 Marks – use of the term "Century" followed by the numeral "21" – are well-recognized in the real estate industry.  Thus, this factor favors C21.  Again, this factor is not especially significant because it is undisputed that Century's Marks do not use the numeral "21."

### 5.  Century did Not Intend to Create an Association with the C21 Marks

C21 has presented no evidence that the Century Marks were adopted in order to trade on C21's goodwill or to create an association with the C21 Marks.  To the contrary, Century's evidence shows without dispute that the origination of Century's Marks had nothing to do with C21.  Century's former parent company was named Century Agency, Inc. and the word "Surety" was consistent with the company's underwriting of surety bonds.  See Dkt. 124¶¶2-3 at 7,24-25.  As a result, the mark "Century Surety" was formed by combining the words "Century" and "Surety."  Century's good faith adoption of the Marks is also shown by a trademark clearance search it conducted to determine the availability of registering the marks "Century Surety Group" and "Century Insurance Group."  See Dkt. 86, Exh. 2 at 168-69; Dkt. 124 ¶195 at 23.  C21's unfounded speculation that Century adopted its Marks in bad faith simply because Century "did not choose to expand its services and territory until after Century 21 was a well known mark" (Dkt. 95 at 16), is completely unsupported.  See Dkt. 124 ¶26 at 31.  This factor favors Century.

1

**6.   <u>There is No Mental Association Between the Marks</u>**

2          In the context of dilution, it is important to emphasize that C21 seeks to enjoin

3  Century from using marks beginning with the word Century even though the mark "Century

4  21"contains the word Century *and* the numeral "21." (Dkt. 124 ¶¶ 20,109-110,141 at

5  9,14,16,58-59.)  Therefore, the main problem with C21's dilution theory is that it has never

6  registered the term "Century" alone, does not use or advertise the word "Century" alone,

7  prohibits Franchisees from abbreviating or shortening the name "Century C21" to "Century,"

8  and has not produced any survey information to demonstrate that consumers recognize or

9  associate the term "Century" (in isolation) with the mark "Century 21." <u>See</u> Dkt. 124, ¶¶108-

10  12 at 14,58-59.   Moreover, there is no dispute that the word "Century" is extensively

11  employed in both the real estate and insurance industries and therefore is clearly not

12  distinctive.  <u>See</u> Dkt. 124, ¶¶148-150 at 64-69; Dkt. 126, Ex. 60 at ¶2 and Ex. 61 at ¶¶2,10

13  (at least 44 insurance businesses use the term "Century" to promote sales of insurance and

14  at least 126 real estate businesses use the term "Century" to promote sales of real estate).[9]

15  Because C21 has made a concerted effort to ensure that its Marks contain two terms – both

16  "Century" and "21" – there is no factual basis from which a reasonable jury could find that

17  consumers mentally associate the lone word "Century" with the C21 Marks.

18          The lack of evidence regarding "mental association"is further shown by

19  undisputed evidence that, during the parties' 15 years of (undisputed) co-existence, none of

20  C21's 4,500 Franchisees (who employ a total of over 120,000 agents) have ever mentioned

21  Century to C21 despite their duty to report infringing uses of the C21 Marks.  <u>See</u> Dkt. 124,

22  ¶¶165, 177-179, 181, 183-87 at 20-22.  It is also undisputed that C21 itself only became

23  aware of Century's existence when Century's registration applications were published for

24  opposition by the USPTO (<u>id.</u> ¶120 at 14).  <u>See</u> <u>Accuride Int'l</u>, 871 F.2d at 1539 ("the

25  parties' concurrent use of 'Accuride' as a trademark for twenty-five years effectively

26  precluded a finding that the value of "Accuride" trade name could be diluted).  C21 does not

27  _____

28          [9]Although C21disagrees with a small percentage of the names on Century's third-party use
list (<u>see</u> Dkt. 97, Ex.39), the Court relies only on the number of *undisputed* third-party users.

1   dispute that it knows of no instance in which anyone has ever mentally associated its Marks

2   with Century's Marks and it has produced no evidence of such mental association. Dkt. 124,

3   ¶¶186-87 at 22.  Because C21 has not demonstrated a genuine issue of fact regarding the

4   mental association component of likely dilution, this factor favors Century overwhelmingly.

5              **7.    Conclusion on Dilution**

6              Given the Court's findings on (i) the dissimilarity of the parties' Marks and

7   (ii) the lack of mental association between "Century" and the mark "Century 21," no

8   reasonable jury could conclude that Century's Marks are likely to dilute the C21 Marks.  See

9   Fruit of the Loom, 994 F.2d at1363 (applying likelihood of dilution standard; "if 'FRUIT'

10  by itself fell within the protected domain, it could be protected under the Anti-dilution statute

11  against all users, . . . . [t]he humble, humdrum word FRUIT would be barred from use by the

12  Fruit Basket, The Fruit Gallery, and Fruit King, to name only three businesses currently listed

13  in the San Francisco telephone directory").  Thus, the Court will grant summary judgment

14  in favor of Century on C21's Registration Claims.

15  **V.    C21's Statement of Incorporation is Rejected (Dkt. 230)**

16             In opposition to Century's Motion for Summary Judgment on the Registration Claims,

17  C21 filed a "Statement of Facts and Disputed Facts in Opposition to Motion for Summary

18  Judgment on Remaining Counts" ("C21's Statement of Facts").  See Dkt. 230.   The first

19  page of the Statement of Facts asserts,

20             Century 21 also incorporates the following as if fully set forth

21             herein [sic] [1] Century 21's Responses to Statements of Fact

22             and Statements of Fact in Support of Plaintiff's Opposition to

23             Defendant's Motions for Summary Judgment, [2]Century 21's

24             Statements of Fact in Support of its Motion for Summary

25             Judgment on Counts I, III, and V-VII, and [3] Statements of

26             Facts in Support of Motion for Summary Judgment on Count IX

27             on the Grounds of Abandonment, and papers and declarations

28             filed therewith.

1   Dkt. 230 at 1-2.  The first two documents C21 refers to were submitted in opposition to

2   Century's motions for summary judgment on Counts I through VIII and in support of C21's

3   motion for summary judgment on Counts I, III, and V-VII (collectively, the "Previous

4   Filings").  The third document was submitted in support of C21's motion for summary

5   judgment on Count IX, which has been denied.  See Dkt. 240.

6        For several reasons, the Court rejects C21's statement of incorporation by reference

7   of its Statement of Facts (dkt. 230) into the Previous Filings.

8        First, more than ten months ago, the Court ruled on the Previous Filings and C21 has

9   not demonstrated extraordinary circumstances warranting reconsideration of that order.  See

10  dkt. 239.  The Court's March 16 Order, which granted Century's motions for summary

11  judgment on Counts I through VIII and denied C21's motion for summary judgment on

12  Counts I, III, and V through VII, was interlocutory. (Dkt. 177.)  Although the power to

13  reconsider an interlocutory order is committed to the discretion of the Court, that discretion

14  is not unfettered.  See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988)

15  ("A court has the power to revisit prior decisions of its own or of a coordinate court in any

16  circumstance, although as a rule courts should be loathe to do so in the absence of

17  extraordinary circumstances such as where the initial decision was 'clearly erroneous and

18  would work a manifest injustice.'") (citation omitted).  The Court's broad discretion to

19  reconsider interlocutory orders means it can consider many factors, including prejudice to

20  the parties and the potential for delay.  Moreover, motions to reconsider should be brought

21  and reviewed with the understanding that "[t]he Court's prior rulings . . . 'are not intended

22  as mere first drafts, subject to revision and reconsideration at a litigant's pleasure,'" and that

23  "ill-founded requests for reconsideration of issues previously decided 'needlessly take the

24  court's attention from current matters and visit inequity upon opponents who, prevailing in

25  an earlier proceeding, must nevertheless defend their position again and again.'"  Berger v.

26  Xerox Ret. Income Guar. Plan, 231 F.Supp.2d 804, 820 (S.D.Ill. 2002) (citations omitted).

27       In the present case, C21's statement that it incorporates the Statement of Facts into

28  the Previous Pleadings is devoid of any reason why incorporation, which would effectively

1   require reconsideration of the March 16 Order, should be permitted, and thus does not even
2   come close to establishing "extraordinary circumstances." <u>Christianson</u>, 486 U.S. at 817.
3   C21 has not come forward with any evidence to suggest that the March 16 Order was clearly
4   erroneous or that it would work a manifest injustice.   Moreover, Century's summary
5   judgment motions on Counts I through VIII were filed after discovery was completed and
6   C21 has failed to demonstrate that its Statement of Facts does not include evidence that was
7   developed after the discovery cut-off and that the presentation of such evidence will not
8   prejudice Century.  Thus, C21's statement of incorporation of the Statement of Facts is
9   rejected.  <u>See</u> <u>Rothwell Cotton Co. v. Rosenthal & Co.</u>,  827 F.2d 246, 251 (7th Cir.1987)
10  (a motion for reconsideration "cannot in any case be employed as a vehicle to introduce new
11  evidence that could have been adduced during pendency of the [underlying] motion.").

12         Second, C21 has filed a motion to reconsider the Court's decision dismissing its
13  federal dilution claim (<u>see</u> dkt. 235) on the grounds that Congress recently revised the federal
14  dilution standards.  However, C21 cannot combine its request for reconsideration under the
15  "new law" with new evidence without first demonstrating that such evidence could not have
16  been obtained through the exercise of due diligence and presented when the summary
17  judgment motions were initially filed, in 2005.  Here, C21's request to incorporate new
18  evidence and facts into the Previous Filings is not supported by any explanation why such
19  evidence could not have been presented in 2005.  Thus, C21's statement of incorporation of
20  the Statement of Facts is rejected for this reason as well.

21         Third, before ruling on both parties' summary judgment motions on Counts I through
22  VIII, the Court considered four separate sets of briefs, two separate statements of fact
23  containing a combined total of 425 separate "facts," three motions to strike, and eight banker
24  boxes of supporting evidence.  <u>See</u> Dkts. 83-86, 95-99, 116-117, 120-144, 150, 154-172.
25  After oral argument, the Court issued an 89-page document order explaining the bases for
26  its decision. (Dkt. 177.) C21's statement of incorporation of its newly-drafted Statement of
27  Facts into the Previous Filings, which were considered and ruled upon more than nine
28  months ago, is not permitted by the Federal Rules of Civil Procedure, the Court's Local

1    Rules or any other authority.  Instead, its request is contrary to several well-established
2    doctrines implicating finality.  The Court takes strong exception to this form of advocacy.
3           Finally, incorporation of C21's Statement of Facts into the Previous Filings would not
4    affect the Court's March 16 Order in any event.  Many of the statements of fact contradict
5    the Court's previous rulings that "21st Century Insurance Company" and "New Century Title
6    Company" are not at issue here because neither C21's Complaint nor its counterclaim allege
7    that Century has infringed such marks (supra at n.1).  See Dkt. 230 at ¶¶1-3, 5-8, 10, 20, 22.
8    Many of the other statements of fact are unsupported by any evidence, and therefore do not
9    constitute "specific facts showing that there is a genuine issue for trial" under Fed.R.Civ.P.
10   56(e).  See Dkt. 230 at ¶¶ 12, 29, 30, 32-37.  Several statements cite evidence even though
11   they were previously found to be unsupported by any evidence and now they remain
12   unsupported by any evidence or refer to new evidence that C21 has not shown to be
13   previously unavailable.  See Dkt. 230 at ¶¶9, 11, 13, 16, 21, 28, 31.  Finally, several
14   statements are simply irrelevant in the context of the instant Motion for Summary Judgment
15   on Counts IX and X and the previous motions for summary judgment on Counts I through
16   VIII.  See Dkt. 230 at ¶¶14, 24-26.
17          For all of these reasons, the Court specifically denies and rejects C21's assertion that
18   it is incorporating the Statement of Facts (dkt. 230) into the Previous Filings.

19                                        **CONCLUSION**

20          Based on the record, the Court finds C21's Registration Claims, grounded on theories
21   of likelihood of confusion and dilution, are only speculative, theoretical possibilities.  The
22   Court is not concerned with mere theoretical possibilities of confusion or dilution but with
23   the practicalities of the commercial world, with which the trademark laws deal.  The Court
24   has carefully considered all of the evidence pertaining to the relevant Sleekcraft and dilution
25   factors, as well as the parties' arguments with respect thereto (including any evidence and
26   arguments not specifically discussed in this Order).  For the reasons set forth above, the
27   Court will grant summary judgment in Century's favor on Claims IX and X.
28          Accordingly,

**IT IS HEREBY ORDERED GRANTING** Century's Motion for Summary Judgment on the Remaining Counts, Counts IX and X (counterclaim in dkt. 13).   (Dkt. 221.)[10]

**IT IS FURTHER ORDERED** that C21's request for cancellation of the mark "Century Insurance Group" is **DENIED**.

**IT IS FURTHER ORDERED** that C21's opposition to Century's application to register the mark "Century Surety Group," is **REJECTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to certify a copy of this Memorandum of Decision and Order to the Commissioner of the Patent and Trademark Office.[11]

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

DATED this 8th day of February, 2007.

Stephen M. McNamee
United States District Judge

---

[10] The Court will not entertain any generic motions for reconsideration.  The Court has exhaustively reviewed both parties' evidence and briefs submitted in connection with the pending motion for summary judgment.  Motions for reconsideration are disfavored, and are not the place for parties to make new arguments not raised in their original briefs or at argument.  Northwest Acceptance Corp. v. Lynnwood Equip., Inc., 841 F.2d 918, 925-26 (9th Cir. 1988).  Nor is reconsideration to be used to ask the Court to rethink what it has already thought, or to repeat in any manner any oral or written argument made in support of or in opposition to the original motion.  See United States v. Rezzonico, 32 F.Supp.2d 1112, 1116 (D.Ariz.1998) (citing Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D.Va.1983)).  Any post judgment motion must be filed according to the Federal Rules of Civil Procedure

[11] Where a court makes determinations involving a registered mark that requires the registrations of any party to the action to be rectified, the Lanham Act affirmatively requires notification to the Director of the USPTO.  See 15 U.S.C. § 1119.  In this case, the Court denied C21's request to cancel the registered mark "Century Insurance Group" and rejected C21's opposition to Century's application to register the mark "Century Surety Group."  Although it is unclear whether either determination requires the registrations of Century to be rectified, in an abundance of caution, the Court has ordered that a copy of this Memorandum of Decision and Order be certified to the Commissioner of the Patent and Trademark Office.